**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 0 1 2023

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

JONES DIGITAL, LLC                           **PLAINTIFF**

VS.                  NO. 2:23-cv-220-LPR

ARKANSAS COUNTY, ARKANSAS;
THOMAS BEST, in his official capacity
as Arkansas County Judge; JOHNNY
CHEEK, in his official capacity as
Arkansas County Sheriff; TIM BLAIR,
in his official capacity as
Arkansas County Prosecuting Attorney         **DEFENDANTS**

## VERIFIED COMPLAINT

Plaintiff Jones Digital, LLC ("Jones Digital") brings this verified complaint against defendants Arkansas County, Arkansas; Thomas Best, in his official capacity as Arkansas County Judge; Johnny Cheek, in his official capacity as Arkansas County Sheriff; and Tim Blair, in his official capacity as Arkansas County Prosecuting Attorney. This action arises from the Arkansas County Quorum Court's passage of an ordinance on October 10, 2023 that bars and facially discriminates against Jones Digital's lawful business activities.

### JURISDICTION, VENUE, AND PARTIES

1.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution, laws, or treaties of the United States.

This case assigned to District Judge Rudofsky
and to Magistrate Judge Heamay

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action arises between citizens of different states, and the amount-in-controversy exceeds $75,000, exclusive of interest and costs.

3.      This Court additionally has supplemental jurisdiction over state law claims that are so related to federal questions that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

4.      Venue is proper in this Court because the United States District Court for the Eastern District of Arkansas, Delta Division, is the federal judicial district in which each defendant resides and where the real property at issue is situated. 28 U.S.C. §§ 1391 and 83(a)(2).

5.      Jones Digital is a limited liability company whose citizenship is determined by the citizenship of its constituent members. *GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004).

6.      Jones Digital's members are Alpha Digital One, LLC, Eagle Asset Holding, Inc., Beskor Balance, Inc., and NewRays Inc.

7.      A corporation's citizenship "is (1) the state of incorporation, and (2) the state where the corporation's principal place of business is located." *GMAC*, 357 F.3d at 828 (citing 28 U.S.C. § 1332(c)(1)).

8.      Alpha Digital One, LLC is a limited liability company whose sole constituent member is Alpha Digital Holding, Inc., a corporation incorporated under the laws of Delaware with its principal place of business in Delaware. Therefore, Alpha Digital One, LLC is a citizen of Delaware for purposes of diversity jurisdiction.

9.      Eagle Asset Holding, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Delaware. Therefore, Eagle Asset Holding, Inc. is a citizen of Delaware for purposes of diversity jurisdiction.

10.     Beskor Balance Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Delaware. Therefore, Beskor Balance, Inc. is a citizen of Delaware for purposes of diversity jurisdiction.

11.     NewRays Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Delaware. Therefore, NewRays, Inc. is a citizen of Delaware for purposes of diversity jurisdiction.

12.     Arkansas County, Arkansas is a municipal corporation under Arkansas law. *See White County v. Cities of Judsonia, Kensett and Pangburn*, 369 Ark. 151, 251 S.W.3d 275 (2007).

13.     Therefore, Arkansas County, Arkansas is a citizen of Arkansas for purposes of this Court's exercise of diversity jurisdiction. *Moor v. County of Alameda*, 411 U.S. 693, 718 (1973).

14.     Thomas Best is a natural person and citizen of Arkansas and is sued in his official capacity as Arkansas County Judge. Judge Best is the duly-elected chief executive officer of Arkansas County, Arkansas and is the official charged with enforcing the ordinances and local laws enacted by the Arkansas County Quorum Court.

15.     Johnny Cheek is a natural person and citizen of Arkansas and is sued in his official capacity as Arkansas County Sheriff. Sheriff Cheek, through his

agents, employees, and instrumentalities, is the official charged with issuing citations of violation of the ordinances and local laws enacted by the Arkansas County Quorum Court.

16.     Tim Blair is a natural person and citizen of Arkansas and is sued in his official capacity as Arkansas County Prosecuting Attorney. Mr. Blair is the official charged with prosecuting and enforcing violations of the ordinances and local laws enacted by the Arkansas County Quorum Court.

17.     Because Jones Digital is a citizen of Delaware, and all Defendants are citizens of Arkansas, there is complete diversity of citizenship between Jones Digital and all Defendants.

18.     Jones Digital brings federal constitutional claims against all defendants under Fed. R. Civ. P. 57, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and state law claims arising under the Arkansas Declaratory Judgment Act and the Arkansas Constitution. Ark. Code Ann. § 16-111-102.

19.     Jones Digital's state law claims derive from the same common nucleus of operative fact so as to form the same case or controversy as the federal claims, thereby warranting the independent exercise of supplemental jurisdiction under 28 U.S.C. § 1367.

## BACKGROUND

20.     On March 24, 2023, Jones Digital entered into a commercial lease for real property in Arkansas County, Arkansas (hereafter "parcel") for the purpose of

engaging in the business of operating a data center, including mining digital assets such as cryptocurrency.[1]

21.     Ever since entering into the lease agreement, Jones Digital has taken concrete steps and expended considerable funds to plan and build a facility and to begin operations of the data center on the parcel.

22.     On April 13, 2023, the Arkansas General Assembly enacted Act 851 of 2023, known as the Arkansas Data Centers Act of 2023 ("Act 851"). Ark. Code Ann. § 14-1-601, *et seq*. A copy of Act 851 as engrossed is attached as Exhibit 2.

23.     On July 11, 2023, the Arkansas County Quorum Court enacted Ordinance 2023-11 ("July Ordinance"), which contained an "emergency clause" intended so that the provisions of the July Ordinance would take immediate effect before the effective date of Act 851. A copy of the July Ordinance is attached hereto as Exhibit 3.

24.     The July Ordinance imposed substantive requirements on the operations of data centers, defined as "a facility constructed and operated that is engaged in storage, management, processing, and transmission of digital data, including facilities used for cryptocurrency mining, which houses networked computer systems along with supporting equipment such as batteries, back-up generators, HVAC and cooling equipment."

---

[1] A copy of the lease entered March 24, 2023 is being submitted under seal as Exhibit 1. Jones Digital also seeks entry of a protective order to preserve the confidentiality of Jones Digital's commercial information, and Jones Digital is presumptively marking Exhibit 1 as "CONFIDENTIAL – SUBMITTED UNDER SEAL" for the purpose of preserving that confidentiality for itself and other persons identified therein.

25. Jones Digital's data center is a "data center" within the meaning of the July Ordinance.

26. The July Ordinance required Jones Digital to give notice of its intent to build and operate a data center on its parcel to all residents within a half-mile radius of the parcel.

27. The July Ordinance required Jones Digital to conduct a third-party sound study, submit a copy of that third-party report to defendant Arkansas County Judge Thomas Best and file it with the county clerk.

28. The July Ordinance required Jones Digital to consult with a third-party to develop a building plan that included sound attenuation measures to mitigate sound emanation from Jones Digital's facility.

29. The July Ordinance imposed maximum decibel limitations of 65 dBa between 8 a.m. to 10 p.m. and 55 dBa between 10 p.m. and 8 a.m.

30. On August 1, 2023, Act 851 became effective.

31. Act 851 prohibits interposition by local governments of discriminatory requirements targeting data centers.

32. The text of Act 851 expressly provides that the purpose of the Arkansas General Assembly in enacting Act 851 was to "clarify the guidelines needed to protect data asset miners from discriminatory industry specific regulations and taxes." Ark. Code Ann. § 14-1-602(b)(2).

33. Under Act 851, a "digital asset mining business" means a group of computers working at a single site that consumes more than one megawatt (1 MW)

6

on an average annual basis for the purpose of generating digital assets by securing a blockchain network." Ark. Code Ann. § 14-1-603(5).

34.    Jones Digital's use of the parcel is a "digital asset mining business" as defined and protected under Act 851. *Id.*

35.    Thus, Jones Digital "may operate in [Arkansas] if [it] complies with (1) state law concerning business guidelines and tax policies; (2) any ordinance concerning operations and safety; (3) any rule or rate for utility service provided by or on behalf of a public entity; and (4) state and federal employment laws." Ark. Code Ann. § 14-1-604(a).

36.    Act 851 defines "local government" as "a county, a city of the first class, a city of the second class, or an incorporated town." Ark. Code Ann. § 14-1-603(8).

37.    Arkansas County, Arkansas is a "local government" under Ark. Code Ann. § 14-1-603(8).

38.    Notwithstanding the general anti-discrimination provisions of Act 851, a local government may through ordinance regulate **certain** digital mining operations, but only if such ordinance falls within the definition of Ark. Code Ann. § 14-1-603(10).

39.    Under Act 851, "ordinance" means "an ordinance, regulation, or other appropriate legislative enactment of a legislative body that (A) prohibits an individual from operating a business from a ***residence***; or (B) requires an individual to obtain approval before operating a business from a ***residence***." Ark. Code Ann. § 14-1-603(10) (emphasis added).

7

40.    Thus, as defined by Act 851, the definition of "ordinance" is limited to the regulation of a "digital asset mining business" to be operated at a "residence." *Id.*

41.    Under Act 851, a local government may enact and enforce an ordinance concerning operation and safety that "prohibits an individual from operating a business *from a residence*" or "requires an individual to obtain approval before operating a business *from a residence*." Ark. Code Ann. 14-1-603(10) (emphasis added).

42.    Jones Digital's operating site in Arkansas County, Arkansas is not a residence.

43.    Therefore, Act 851 authorizes Jones Digital to operate a digital asset mining business at its operating site, notwithstanding any local measures or regulations purportedly enacted by the Arkansas County Quorum Court.

44.    Under Act 851, a local government "shall not rezone an area with the intent or effect of discriminating against a digital asset mining business." Ark. Code Ann. § 14-1-605(a)(4).

45.    On September 15, 2023, Jones Digital submitted to the Arkansas County Clerk certification of its compliance with the requirement of the July Ordinance to notify to all property owners within 0.5 miles of Jones Digital's facility in Arkansas County, Arkansas of its intent to build a data center.

46.    On September 19, 2023, defendant Arkansas County Judge Thomas Best directly stated to Jones Digital's agent, Cliff Evans, that Jones Digital was

8

authorized by Arkansas County to begin construction of its facility in Arkansas County.

47.    On September 22, 2023, Jones Digital submitted to the Arkansas County Clerk its sound study and site plans as required by the July Ordinance.

48.    On September 28, 2023, Jones Digital began construction of its data center on its parcel based on the authorization granted by Judge Best.

49.    Jones Digital is scheduled to complete construction in November 2023.

50.    Upon completion of construction, Jones Digital will promptly begin operating its data center.

51.    Such operations will be undertaken, with the authorization of Arkansas County Judge Best, consistent with the requirements contained in the July Ordinance, including the sound decibel limitations imposed by the July Ordinance.

52.    On October 10, 2023, 70 days after Act 851 had taken effect, the Arkansas County Quorum Court passed a new ordinance specifically targeting Jones Digital's ongoing construction project and forthcoming business expectancy ("October Ordinance"). A copy of the October Ordinance is attached as Exhibit 4.

53.    At the time the October Ordinance was passed, all Defendants and all members of the Arkansas County Quorum Court had actual or constructive knowledge of Jones Digital's intended use of its parcel by virtue of Jones Digital's adherence to the notification and submission requirements of the July Ordinance.

9

54.     The October Ordinance purports to impose infeasible burdens and impracticable requirements intended to prevent Jones Digital from operating its business as intended.

55.     The October Ordinance purports to impose maximum decibel limitations of 55 dBa between 8 a.m. to 8 p.m. and 45 dBa between 8 p.m. and 8 a.m.

56.     Compliance with these purported decibel levels is impossible, as the general ambient sound level around the facility routinely exceeds 45 dBa, including sound generated from highway traffic on an adjacent Arkansas state highway, as well as airplanes based at a nearby airstrip.

57.     The October Ordinance purports to impose a maximum decibel limitation of 70 dBa "for the point above the Data Center."

58.     The October Ordinance imposes civil and criminal penalties for violation, which threatens Jones Digital, as well as its owners and agents, with criminal exposure, including substantial daily monetary fines, together with "injunctive relief and any civil damages the court deems appropriate."

59.     The October Ordinance also authorizes separate citizen causes of action against digital mining operations such as Jones Digital's planned operations, which facially exceeds the scope of local authority conferred to local governments under Arkansas general law.

60.     The October Ordinance also requires Jones Digital to notify "all hunters that utilize the area for hunting in a ten (10) mile radius and all waterfowl hunting clubs that operate as a for profit business in a twenty (20) mile radius."

61.     The October Ordinance does not define "hunters;" "area for hunting;" "the point above the Data Center;" or "waterfowl hunting clubs."

62.     Neither the July Ordinance, nor the October Ordinance, applies to other business operations in Arkansas County, including numerous agricultural, industrial, and other commercial ventures that generate substantial sound.

63.     At the time of passage of the October Ordinance, Defendant County Attorney Tim Blair had received specific legal counsel that the hunter-notification provision "seems unreasonable," and was functionally impossible to comply with.

64.     At the time of passage of the October Ordinance, Defendants and all members of the Arkansas County Quorum Court knew that Act 851 had already become effective to "protect data asset miners from discriminatory industry specific regulations." Ark. Code Ann. § 14-1-602(b)(2).

65.     The October Ordinance was passed after defendant Arkansas County Judge Eddie Best was expressly advised by Mark Whitmore, Chief Counsel of the Association of Arkansas Counties, that the such an ordinance would be "too late" after August 1, 2023, due to the effective date of Act 851.

66.     On October 9, 2023, the day before the October Ordinance was passed by the Arkansas County Quorum Court, defendant Arkansas County Judge Eddie

11

Best stated to Whitmore, "I don't think [the] Quorum Court will even consider [the October Ordinance]."

67.    In response, also on October 9, 2023, Whitmore stated, "very doubtful the [AACRMF] risk management fund will defend or cover the damages if any claimed on a lawsuit on whether the [Quorum Court] amendment to the ordinance is defendable."

68.    Moreover, Whitmore stated, "as we have discussed amending after [A]ugust 1st and the subject amendments are beyond that assistance."

69.    Thus, the October Ordinance was passed by the Arkansas County Quorum Court after it had received specific legal advice that such an ordinance would be voidable as in violation of Arkansas law.

70.    Moreover, the October Ordinance was passed after Defendants and all members of the Arkansas County Quorum Court had actual or constructive notice that Jones Digital had already complied with the notification, sound study, site design, and noise attenuation requirements of the July Ordinance.

71.    The October Ordinance was passed after defendant Arkansas County Judge Thomas Best had already authorized Jones Digital to begin construction and business operations in compliance with the July Ordinance.

72.    The October Ordinance was passed after Jones Digital had already commenced construction for the purpose of beginning business operations at its real property in Arkansas County, Arkansas.

73.     At the meeting of the Arkansas County Quorum Court where the October Ordinance was passed, defendant Tim Blair, in his capacity as County Attorney for Arkansas County, Arkansas, specifically stated, "I do think there is a chance we will end up in court over this."

74.     At that meeting a supporter of the October Ordinance claimed, "we are making it as restrictive as we think it is legally possibly for us."

75.     The comments and statements made at the meeting of the Arkansas County Quorum Court on October 10, 2023 confirm that the purpose of the October Ordinance was to prevent Jones Digital from commencing business operations at its facility in Arkansas County, Arkansas.

76.     The Arkansas County Quorum Court is a creature of Arkansas state statute, and its powers are subject and subordinate to statutory enactments of the Arkansas General Assembly. *See* Ark. Code Ann. § 14-14-801.

77.     Arkansas law prohibits any quorum court from exercising "any legislative act which denies the individual right of property without just compensation." Ark. Code Ann. § 14-14-805(10).

78.     Arkansas law prohibits any quorum court from exercising "any legislative act contrary to the general laws of this state." Ark. Code Ann. § 14-14-805(13).

79.     The Arkansas County Quorum Court specifically and intentionally passed the October Ordinance despite having actual or constructive knowledge that the October Ordinance was illegal and unenforceable as a matter of Arkansas law.

**COUNT ONE**
**DECLARATORY JUDGMENT RESTRAINING DEFENDANTS FROM**
**ENFORCEMENT OF ARKANSAS COUNTY ORDINANCE 2023-11**

80.     Jones Digital is entitled to a declaratory judgment enjoining the
enforcement of the October Ordinance because the October Ordinance is in facial
violation of Act 851 of 2023.

81.     The October Ordinance facially discriminates against data centers and
crypto miners in violation of Arkansas law.

82.     The October Ordinance intentionally imposes "discriminatory industry
specific regulations" that Act 851 prohibits. Ark. Code Ann. § 14-1-602(b)(2).

83.     Jones Digital has complied and continues to comply with the
requirements contained in the July Ordinance.

84.     The October Ordinance is not an "ordinance" as defined under Ark.
Code Ann. § 14-1-603(10).

85.     Under Act 851, the Arkansas County Quorum Court may not establish,
enforce, or prescribe any facially discriminatory burden or operational regulation on
Jones Digital, or any other digital asset mining business.

86.     Alternatively, upon the effective date of Act 851, or August 1, 2023, the
Arkansas County Quorum Court could no longer establish, enforce, or prescribe any
facially discriminatory burdens or operational regulations on Jones Digital, or any
other digital asset mining business.

87.   Jones Digital complies with all requirements of Ark. Code Ann. § 14-1-604(a) and is therefore entitled to operate its digital asset mining business as a matter of Arkansas law. Ark. Code Ann. § 14-1-604(a).

88.   The October Ordinance is an unlawful attempt by Arkansas County, Arkansas to "rezone an area with the intent or effect of discriminating against a digital asset mining business." This violates Ark. Code Ann. § 14-1-605(a)(4).

89.   The October Ordinance is a legislative act by the Arkansas County Quorum Court that denies Jones Digital the individual right of property without just compensation.

90.   The October Ordinance constitutes a legislative act contrary to the general law of Arkansas, as embodied by Act 851 of 2023 and the Arkansas Constitution.

91.   Jones Digital is entitled to a judgment declaring that it is entitled to operate its business pursuant to Act 851.

92.   Jones Digital is entitled to a judgment declaring that the October Ordinance is facially unenforceable as a matter of Arkansas law.

93.   Jones Digital is entitled to a judgment declaring that the October Ordinance is unenforceable due to its facial conflict with Arkansas general law.

94.   To effectuate these declaratory judgments, and to protect from imminent and foreseeable business injury that will be sustained if the October Ordinance is enforced, Jones Digital requests that the Court enter an injunction

15

restraining Defendants and all their agents, instrumentalities, or employees, from any act to attempt to enforce the October Ordinance.

95.    Jones Digital is also entitled to an injunction restraining Defendants and all their agents, instrumentalities, and employees from retaliating, directly or indirectly, against Jones Digital, and all those acting in concert with Jones Digital, for seeking redress for its grievances.

**COUNT TWO**
**TAKING WITHOUT JUST COMPENSATION (42 U.S.C. § 1983)**

96.    The October Ordinance is so onerous as to cause a taking of Jones Digital's private property without just compensation.

97.    "The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392, 137 S.Ct. 1933, 1942 (2017) (citing U.S. Const. amend. V.).

98.    "A property owner may bring a takings claim under [42 U.S.C.] § 1983 upon the taking of his property without just compensation by a local government." *Knick v. Township of Scott, Pennsylvania*, 139 S.Ct. 2162, 2179 (2019); *see generally Watkins v. Lawrence County, Arkansas*, 2020 WL 13389385 (E.D. Ark. May 19, 2020).

99.    Jones Digital is the owner of a leasehold interest in real property in Arkansas County, Arkansas.

100.    The October Ordinance intentionally imposes infeasible burdens and impracticable requirements on Jones Digital's specific use of the real property in

16

Arkansas County, Arkansas in an effort to prevent Jones Digital's lawful business activities.

101.    Those infeasible burdens and impracticable requirements are specifically intended to deprive Jones Digital of the right to use and enjoy its property based on its distinct and specific investment-backed expectations.

102.    The October Ordinance intentionally, discriminatorily, and specifically interferes with Jones Digital's distinct and specific investment-backed expectations.

103.    The October Ordinance expressly violates governing Arkansas law that prohibits the Arkansas County Quorum Court from exercising legislative authority in this facially discriminatory manner.

104.    The October Ordinance so frustrates Jones Digital's distinct and specific investment-backed expectations that it amounts to a taking of Jones Digital's private property rights.

105.    If the October Ordinance is not enjoined by operation and application of Act 851, then Jones Digital will be deprived of its distinct and specific investment-backed expectations.

106.    Arkansas County, Arkansas has given no compensation to Jones Digital for its intentional and discriminatory taking of Jones Digital's distinct and specific investment-backed expectations at the parcel in Arkansas County, Arkansas.

107.    Jones Digital is entitled to the award of just compensation from Arkansas County, Arkansas due to its deprivation of Jones Digital's specific investment-backed expectations.

108.    To date, Jones Digital has already invested more than $500,000 in capital expenditure specifically related to the parcel in Arkansas County, Arkansas. This investment will be rendered as waste through enforcement or threatened enforcement of the October Ordinance.

109.    Upon expected commencement of Jones Digital's cryptocurrency mining operations in November 2023, Jones Digital anticipates generating net revenue well exceeding $75,000 per year.

110.    If the October Ordinance is allowed to take effect, or the threat of its enforcement allowed to continue, then Jones Digital is entitled to recover from Arkansas County, Arkansas just compensation in the amount of its past capital expenditures and the anticipated net revenue from its distinct and specific investment-backed expectancies, for the duration of its leasehold interest in the parcel.

111.    Jones Digital anticipates generating net revenue of no less than $6,000,000 during the initial five-year period of its commercial lease agreement, in addition to all capital expenditures that risk being rendered as waste, as well as all costs and fees incurred in bringing this action as provided under federal law.

## COUNT THREE
## VIOLATION OF EQUAL PROTECTION (42 U.S.C. § 1983)

112.    The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

113.    Prior to passage of the October Ordinance, Jones Digital had "complied with every requisite deemed by the law, or by the public officers charged with its administration[.]" *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886).

114.    Jones Digital's right to use and enjoy its property interests based on distinct and specific investment-backed expectations is a fundamental right.

115.    The Arkansas County Quorum Court passed the October Ordinance under color of law despite and in defiance of the specific prohibitions imposed by Act 851.

116.    The specific purpose of the October Ordinance was to deprive Jones Digital from the right to use and enjoy its property despite Jones Digital's compliance with the terms of the previously-enacted July Ordinance and the prior approval granted by defendant Arkansas County Judge Thomas Best.

117.    The October Ordinance specifically targets and applies only to "data centers." It does not apply to existing and future industrial, commercial, and other property uses in Arkansas County that create sound in decibel levels greater than the limitations purportedly imposed by the October Ordinance on data centers, such as Jones Digital's.

118.   "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

119.   Upon information and belief, Defendants passed the October Ordinance with the purpose of specifically targeting and intentionally depriving Jones Digital from its rights to the use and enjoyment of its property rights on account of the perceived race, national origin, or ethnic identity of Jones Digital's individual members, agents, employees, and related persons.

120.   Numerous individuals commented in support of passage of the October Ordinance at the October 10, 2023 meeting of the Arkansas County Quorum Court by criticizing the ownership of land by Chinese nationals as reasons to pass the October Ordinance.

121.   The October Ordinance does not withstand strict scrutiny, as it does not further a compelling governmental interest, and it is not narrowly tailored to achieve any such interest.

122.   Numerous individuals made comment in support of passage of the October Ordinance at the October 10, 2023 meeting of the Arkansas County Quorum Court while making specific concessions regarding the invalidity of the October Ordinance by operation of Act 851 of 2023.

123.   Because all Defendants and each member of the Arkansas County Quorum Court had actual and specific knowledge that enforcement of the October Ordinance was squarely prohibited under Arkansas state statute, even at the time

20

of its enactment, the October Ordinance is arbitrary and capricious, and it is not

rationally related to any legitimate governmental interest of Arkansas County,

Arkansas.

124.    Jones Digital has sustained and will continue to sustain damages

proximately caused by the actions of Defendants.

125.    Jones Digital is therefore entitled to recover compensatory damages

under 42 U.S.C. §§ 1982 and 1983 for Defendants' deprivation of its fundamental

rights under color of law.

126.    Defendants are entitled to a preliminary and permanent injunction

that strikes down the October Ordinance and restrains Defendants from acts to

enforce the October Ordinance or any other facially discriminatory legislation.

**COUNT FOUR:**
**INVERSE CONDEMNATION (ARK. CONST. ART 2., § 22)**

127.    "The right of property is before and higher than any constitutional

sanction; and private property shall not be taken, appropriated, or damaged for

public use, without just compensation therefor." Ark. Const. Art. 2, § 22.

128.    "A taking is described as damage that will substantially oust the owner

and deprive him of all beneficial enjoyment thereof; will substantially abridge the

owner's rights to such an extent as to deprive him of his right; will be an

interference with or disturbance of property rights resulting in injuries which are

not merely consequential or incidental; a taking is determined by the character of

the invasion and not by the amount of damage resulting from it, as long as the

damage is substantial." *Thompson v. City of Siloam Springs*, 333 Ark. 351, 359, 969

21

S.W.2d 639, 642 (Ark. 1998) (quoting *City of Fayetteville v. Stanberry*, 305 Ark. 210, 214, 807 S.W.2d 26 (1991)).

129.    "Arkansas has, by statute, authorized a cause of action allowing property owners to obtain compensation for any property so taken." *Roy v. City of Little Rock*, 902 F. Supp. 871, 877 (E.D. Ark. 1995).

130.    The Arkansas Supreme Court has "interpreted this [state Takings Clause] to require compensation for a taking when a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional." *Thompson*, 333 Ark. at 358 (quoting *National By-Products v. City of Little Rock*, 323 Ark. 619, 916 S.W.2d 745 (1996)).

131.    "[W]hen one knows that an invasion of another's interest in the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional." *Robinson v. City of Ashdown*, 301 Ark. 226, 231, 783 S.W.2d 53, 56 (1990).

132.    The specific and unequivocal purpose of the October Ordinance was to take, appropriate, and damage Jones Digital's property right in the use and enjoyment of its leasehold and to interfere with Jones Digital's specific and distinct investment-backed expectations.

133.    Thus, the Arkansas Constitution requires that Arkansas County, Arkansas provide just compensation to Jones Digital for the damages arising from passage of October Ordinance.

134.    Arkansas County, Arkansas has given no compensation to Jones Digital for its taking of Jones Digital's property.

135.    Jones Digital is entitled to the award of just compensation under the Arkansas Constitution, should enforcement of the October Ordinance not be enjoined by order of this Court.

136.    The Arkansas County Quorum Court intentionally enacted an ordinance that it knew or had reason to know was illegal.

137.    The Arkansas County Quorum Court chose to ignore the limitations imposed by Act 851 and passed the October Ordinance despite actual notice that it was unenforceable as a matter of law.

138.    The Arkansas County Quorum Court passed the October Ordinance knowing that passage would cause specific business injury to Jones Digital and that its passage would result in damage to Jones Digital.

## PRAYERS FOR RELIEF

139.    Jones Digital submits alongside its verified complaint a separate motion for temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65, which is incorporated by reference herein.

140.    Jones Digital asks that the Court enter a temporary restraining order to enjoin all defendants from enforcing the October Ordinance as a facial violation of Act 851 of 2023.

141.    Jones Digital asks that the Court enter preliminary and permanent injunctions preventing Defendants from enforcing the October Ordinance as a facial violation of Act 851 of 2023.

142.    Jones Digital asks that the Court enter an order restraining Defendants and their agents, instrumentalities, and employees from retaliating, directly or indirectly, against Jones Digital, and all those acting in concert with Jones Digital, for exercising its right to seek redress for its grievances.

143.    Jones Digital asks that the Court award to Jones Digital all compensatory and punitive damages against all Defendants to which Jones Digital is entitled.

144.    Jones Digital asks that the Court award its costs and reasonable attorneys' fees under 42 U.S.C. § 1988 upon an ultimate finding that Jones Digital is the prevailing party in this action.

WHEREFORE, Jones Digital LLC requests that the Court enter a declaratory judgment that the ordinance passed by the Arkansas County Quorum Court on October 10, 2023 is unenforceable as in facial violation of Act 815 of 2023, as duly enacted by the Arkansas General Assembly; that the Court enter a declaratory judgment that the ordinance passed by the Arkansas County Quorum Court on October 10, 2023 is unenforceable as applied to Jones Digital, LLC due to operation of Act 815 of 2023, as duly enacted by the Arkansas General Assembly; that all Defendants be temporarily restrained, and preliminary and permanently enjoined, from taking any act to enforce the ordinance passed by the Arkansas

County Quorum Court on October 10, 2023; that all Defendants be restrained from retaliating against Jones Digital, LLC, and all those acting in concert with it, for exercising its right to seek redress for its grievances; that Jones Digital LLC be awarded just compensation for the taking of its private property occasioned by passage, threatened enforcement, and any actual or attempted enforcement of the ordinance the Arkansas County Quorum Court passed on October 10, 2023; that Jones Digital LLC be awarded damages, fees, and costs, including reasonable attorneys' fees under 42 U.S.C. §§ 1983 and 1988 on all federal and state constitutional claims brought in this action; and for all other relief to which it is entitled under law.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: sgiles@wlj.com; gjones@wlj.com;
        ajones@wlj.com; wogles@wlj.com


By _____
    Stephen R. Giles (75046)
    Gregory T. Jones (83097)
    Alexander T. Jones (2015246)
    William J. Ogles (2018108)

    *Attorneys for Jones Digital, LLC*

## **VERIFICATION**

I, Qimin "Jimmy" Chan, under oath, do hereby verify that I have reviewed

and attest to fact that the information contained in the above verified complaint is

true and correct to the best of my knowledge, information, and belief.

_Qimin Chan_

Qimin "Jimmy" Chan
Authorized Agent
Jones Digital, LLC

STATE OF ARKANSAS )
ss )
COUNTY OF PULASKI )

Subscribed and sworn to by Qimin "Jimmy" Chan before me this 1st day of
November, 2023.

_Jamie_

Notary Public

My Commission Expires:
7-17-27

Stricken language would be deleted from and underlined language would be added to present law.
Act 851 of the Regular Session

1    State of Arkansas                   *As Engrossed: S4/6/23*
2    94th General Assembly              # A Bill
3    Regular Session, 2023                                    HOUSE BILL 1799
4
5    By: Representative McClure
6    By: Senator J. Bryant
7
8                        ## For An Act To Be Entitled
9              AN ACT TO CREATE THE ARKANSAS DATA CENTERS ACT OF
10             2023; TO CLARIFY THE REGULATION OF THE DIGITAL ASSET
11             MINING BUSINESS; AND FOR OTHER PURPOSES.
12
13
14                              ## Subtitle
15             TO CREATE THE ARKANSAS DATA CENTERS ACT
16             OF 2023; AND TO CLARIFY THE REGULATION OF
17             THE DIGITAL ASSET MINING BUSINESS.
18
19
20   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
21
22       SECTION 1.  Arkansas Code Title 14, Chapter 1, is amended to add an
23   additional subchapter to read as follows:
24
25              Subchapter 5 — Arkansas Data Centers Act of 2023
26
27       14-1-501.  Title.
28       This subchapter shall be known and may be cited as the "Arkansas Data
29   Centers Act of 2023".
30
31       14-1-502.  Legislative findings and intent.
32       (a)  The General Assembly finds that:
33             (1)  The data centers industry began its modern version in the
34   1980s, and the industry has seen accelerated growth since 2008;
35             (2)  Data centers have seen global growth with the expansion of
36   bandwidth, the need for analytical data research, and digital currency;



EXHIBIT 2     04-06-2023 17:41:50 ANS305

As Engrossed:  S4/6/23                                                HB1799

1          (3)  Data centers, digital currency, and blockchain technology
2    are legal in all fifty (50) states; and
3          (4)  Guidance for future industry growth is needed in Arkansas to
4    protect Arkansans from fraudulent business practices.
5      (b)  Through the enactment of this subchapter, the General Assembly
6    intends to:
7          (1)  Recognize that data centers create jobs, pay taxes, and
8    provide general economic value to local communities and this state; and
9          (2)  Clarify the guidelines needed to protect data asset miners
10   from discriminatory industry specific regulations and taxes.
11
12     14-1-503.  Definitions.
13     As used in this subchapter:
14          (1)  "Blockchain network" means a group of computers operating
15   and processing together to execute a consensus mechanism to agree upon and
16   verify data in a digital record;
17          (2)  "Digital asset" means cryptocurrency, virtual currency, and
18   natively electronic assets, including without limitation stable coins,
19   nonfungible tokens, and other digital-only assets, that confer economic,
20   proprietary, or access rights or powers;
21          (3)  "Digital asset miner" is an individual who mines for digital
22   assets;
23          (4)  "Digital asset mining" means use of electricity to power a
24   computer for the purpose of securing or validating a blockchain network;
25          (5)  "Digital asset mining business" means a group of computers
26   working at a single site that consumes more than one megawatt (1 MW) on an
27   average annual basis for the purpose of generating digital assets by securing
28   a blockchain network;
29          (6)  "Home digital asset mining" means mining digital assets in
30   areas zoned for residential use;
31          (7)  "Legislative body" means the quorum court of a county or the
32   city council, board of directors, board of commissioners, or similar elected
33   governing body of local government;
34          (8)  "Local government" means a county, a city of the first
35   class, a city of the second class, or an incorporated town;
36          (9)(A)  "Node" means a computational device that contains a copy

1   of blockchain-distributed ledger technology.
2                  (B)  "Node" includes a series;
3          (10)  "Ordinance" means an ordinance, resolution, or other
4   appropriate legislative enactment of a legislative body that:
5                  (A)  Prohibits an individual from operating a business from
6   a residence; or
7                  (B)  Requires an individual to obtain approval before
8   operating a business from a residence;
9          (11)  "Person" means an individual or legal entity; and
10         (12)  "Residence" means a permanent dwelling place, unit, or
11  accessory structure.
12
13      14-1-504.  Digital asset mining.
14      (a)  A digital asset mining business may operate in this state if the
15  digital asset mining business complies with:
16              (1)  State law concerning business guidelines and tax policies;
17              (2)  Any ordinance concerning operations and safety;
18              (3)  Any rule or rate for utility service provided by or on
19  behalf of a public entity; and
20              (4)  State and federal employment laws.
21      (b)  A digital asset miner shall:
22              (1)  Pay applicable taxes and government fees in acceptable forms
23  of currency; and
24              (2)  Operate in a manner that causes no stress on an electric
25  public utility's generation capabilities or transmission network.
26      (c)  An individual may utilize a node in this state for the purpose of
27  operating home digital asset mining at the individual's residence according
28  to applicable utility rules and rates.
29      (d)  A person may have a digital asset mining business in an area that
30  is zoned for industrial use that has not been designated by the local
31  government for other uses.
32      (e)  A person that is engaged in home digital asset mining or that has
33  a digital asset mining business shall not be considered a money transmitter
34  under the Uniform Money Services Act, § 23-55-101 et seq.
35
36      14-1-505.  Discrimination against digital asset mining business

As Engrossed: S4/6/23                                                    HB1799

1    prohibited.
2         (a)  Except as provided by subsection (d) of this section, a local
3    government shall not:
4              (1)  Enact or adopt an ordinance, policy, or action that limits
5    the sound decibels generated from home digital asset mining other than the
6    limits set for sound pollution generally;
7              (2)  Impose a different requirement for a digital asset mining
8    business than is applicable to any requirement for a data center;
9              (3)  Rezone an area in which a digital asset mining business is
10   located without complying with applicable state law and local zoning
11   ordinances; or
12             (4)  Rezone an area with the intent or effect of discriminating
13   against a digital asset mining business.
14        (b)  A digital asset mining business may appeal a change in zoning of
15   an area by a local government under any applicable state law or local zoning
16   ordinance.
17        (c)  If consistent with applicable state and federal statutes, orders,
18   rules, and regulations, including without limitation § 23-3-114 and § 23-4-
19   103, the Arkansas Public Service Commission shall not establish an
20   unreasonably discriminatory rate for a digital asset mining business
21   customer.
22        (d)  The prohibitions under subsection (a) of this section do not apply
23   to any rule or rate for utility service provided by or on behalf of a public
24   entity.
25
26                              /s/McClure
27
28
29                         APPROVED: 4/13/23
30
31
32
33
34
35
36

                                  4                04-06-2023 17:41:50 ANS305

ORDINANCE NO. 2023- 11

Recorded in
ORDINANCE-RESOLUTION Book
07/11/2023  10:30
County Clerk
ARKANSAS County, AR

AN EMERGENCY ORDINANCE ADOPTING CERTAIN RULES AND REGULATIONS
CONCERNING EXTERNAL NOISE ATTENUATION OF DATA CENTERS AND TO
PREVENT NOISE DISTURBANCE IN ARKANSAS COUNTY AND WITHIN ITS
UNINCORPORATED LIMITS; TO DECLARE AN EMERGENCY; AND FOR OTHER
PURPOSES

BE IT ORDAINED AND ENACTED BY THE QUORUM COURT OF ARKANSAS
COUNTY, ARKANSAS THAT:

WHEREAS, the equipment associated with the cooling systems and generators required
to operate data centers generate broadband noise and low-frequency hums that result in noise
disturbance. Noise disturbance is the cause of degradation and may produce negative impacts on
public health, property and the environment.

WHEREAS, noise attenuation should be an integral part of the design and construction
of data centers in order to prevent noise pollution and noise disturbance.

WHEREAS, the county finds that the public interest is served by the prevention of
unreasonable noise emanating externally from the Data Centers and the provisions of this
Ordinance are enacted for the purpose of preserving and protecting the public health, safety,
welfare and property of the citizens of Arkansas County, Arkansas.

ARTICLE I: PURPOSE AND APPLICABILITY: All Data Centers constructed within
this jurisdiction shall be designed and built to incorporate external noise attenuation measures in
order to minimize the impact of noise disturbance on the residents of Arkansas County, Arkansas.
This ordinance shall apply to limit the noise disturbance originating within the unincorporated
limits of Arkansas County, Arkansas.

ARTICLE II: DEFINITIONS: For the purpose of this Ordinance, the following
definitions shall apply unless the context clearly indicates or requires a different meaning:

1. *Ambient Noise*: The all-encompassing noise level associated with a given environment,
being a composite of sounds from all sources, excusing the alleged offensive noise, at the
locations and approximate time at which comparison with the alleged offensive noise is
to be made.

2. *Data Center*: A facility constructed and operated that is engaged in storage, management,
processing, and transmission of digital data, including facilities used for cryptocurrency
mining, which houses networked computer systems along with supporting equipment
such as batteries, back-up power generators, HVAC and cooling systems.

FILED

JUL 11 2023

TIME:  10:30 Am

MELISSA WOOD, CLERK
ARKANSAS COUNTY, ARKANSAS

EXHIBIT 3

3. *Decibel (dB)*: A unit for measuring the volume of a sound, equal to twenty (20) times to the base 10 (10) of the ratio of the pressure of the sound measured to the referenced pressure, which is twenty (20) micropascals (twenty (20) micronewtons per square meter.)

4. *Mechanical Equipment*: The networked computer systems along with supporting equipment such as batteries, backup generators, and cooling systems housed on the Data Center's property.

5. *Noise Attenuation*: The reduction of noise levels through the use of sound-absorbing material, architectural design techniques, and/or any other suitable means.

6. *Noise Disturbance*: any sound which:

    a. Endangers or injures the safety or health of humans or animals; or

    b. Annoys or disturbs a reasonable person of normal sensitivities; or

    c. Endangers or injures person or real property.

7. *Person*: An individual, association, partnership, or corporation, including any officer, employee, department, or agency.

8. *Property Line*: An imaginary line along the ground surface, and its vertical extension, which separates the real property owned by one person from that owned by another person, but not including intra-building real property divisions.

9. *Sound*: An oscillation in pressure, particle displacement, particle velocity or other physical parameter, in a medium with internal forces that causes compression and rarefaction of that medium. The description of sound may include any characteristic of such sound, including duration, intensity and frequency.

10. *Sound Level*: The weighted sound pressure level obtained by the use of s sound level meter and frequency weighting network, such as A, B, or C as specified in American National Standards Institute specifications for sound level meters (ANSI SI. 4-1971, or the latest approved revision thereof). If the frequency weighting employed is not indicated, the A-weighting shall apply.

11. *Sound Level Meter*: An instrument which includes a microphone, an amplifier, RMS detector, integrator or time averager, output meter, and weighting networks used to measure sound pressure levels.

**ARTICLE III: NOISE ATTENUATION REQUIREMENTS:** Before a Data Center has commenced construction or operating within this jurisdiction, the property owner and operator proposing to build a Data Center shall comply with the following:

1. *Notice Requirements*

    a. The property owner and operator must notify all residents within a half-mile radius of the parcel, including any affiliated homeowners' association operating within the half-mile radius, that the property owner and operator intend to build and operate a Data Center on the property. The notice required in this section must be mailed to all postal addresses and homeowners' association addresses contained within a half-mile radius extending from the property line where the proposed Data Center will be built. Proof of notification shall be filed with the county clerk's office within 30 days of providing notice. The property owner and operator must notify the County Judge that the property owner and operator intends to build and operate a Data Center. The notification must include the location for the proposed data center.

2. *Noise Study Requirements*

    a. The property owner of the lands upon which the Data Center is to be located shall conduct a sound study performed by a third-party acoustic engineer to document baseline sound levels in the area of the proposed Data Center, including noise levels measured at the property line in eight locations (north, south, east, west, northeast, northwest, southeast, southwest.) The report of the study must include sound mitigation recommendations based on the results of the sound study. The property owner must provide a copy of the report of the study to the county judge and file with the county clerk within 30 days of completion of the report.

3. *Noise Attenuation Plan Requirements*

    a. The property owner must consult with a third- party architectural or design firm to develop a building plan that includes necessary noise attenuation measures in order to prevent the external sound level emanating from the Data Center from exceeding the sound level limitations below which will be considered a noise disturbance. The building plan is not required to adopt any or all of the noise attenuation recommendations so long as the plan includes noise attenuation

measures that the architectural or design firm deems adequate to be in compliance with this Ordinance. Noise attenuation measures may include but not limited to:

     i. Soundproofing walls, screens, panels, fences, or enclosures

     ii. Buffer yards

     iii. Other noise attenuation measures recommended by the third-party acoustic engineer

b. Mechanical equipment must be shown on any proposed plan and must be fully screened on all sides. Mechanical equipment not screened by a facade of the building must be screened by a visually solid fence, screen wall or panel, or parapet wall and constructed with a design, materials, details, and treatment compatible with those used on the nearest facade of the building.

c. The property owner must provide a copy of the building plan to the county judge and file with the county clerk within 30 days of completion of the plan prior to construction.

d. Any additions, changes, or expansions of the Data Center must comply with the noise attenuation requirements of this Ordinance and must be designed and submitted to the county judge and file with the county clerk within 30 days of completion of the report.

4. *Post Completion Noise Study Requirements*

a. Upon the Data Center's completion, the Data Center operator must conduct a post-construction noise study performed by a third-party acoustic engineer to document noise levels emanating from the Data Center when mechanical equipment is running at full capacity, including all HVAC units and generators necessary for peak operation. Noise levels are to be measured at the property line in the original eight locations used during the baseline study. The Data Center operator must provide a copy of the report to the county judge and file with the county clerk within 30 days of completion of the study.

b. The Data Center shall not begin operations until the completion of the postconstruction noise study and submission to the county judge and county clerk as required above. In order for the Data Center to be in compliance, the noise study results must show that its operation is in compliance with this Ordinance. If the

results show that the Data Center is not in compliance with this Ordinance, the
Data Center will be unable to commence operation until the required noise
attenuation measures and noise limitations are met.

c. Furthermore, the Data Center operator must conduct annual noise studies under
the baseline and post-construction studies specifications in accordance with
subsections (a) and (b) above. The Data Center operator must provide the results
to the county judge and file with the county clerk within 30 days after the
anniversary date of the first sound study report.

**ARTICLE IV: PROCEDURE FOR MEASUREMENT:** All tests shall be conducted
according to the following procedures:

1. *Complaint Driven:* When the measurement is the result of a complaint, measurements
will be taken at the property line of the receiving property.

2. *Normal Monitoring:* When the measurement procedure is in the normal course of
monitoring sound, the measurements will be taken at the real property line of the source
of the sound.

3. *Outdoor Conditions:* No outdoor measurements must be taken while winds exceed
(Including gusts) 15 miles per hour; under conditions that will allow the sound level
meter to become wet; or when the ambient temperature is out of range of tolerance on the
sound meter.

4. *Calibration:* The sound level meter must be verified and calibrated according to the
manufacturer's specifications immediately prior to taking the measurements.

5. *Meter Placement:* The sound level meter must be placed a minimum of four feet above
the ground or from any reflective surface. The microphone must be pointed at the sound
source.

6. *Measurements:* Measurements must include "high", "average", and "low" readings. If the
sound level meter does not provide these multiple readings, a minimum of three separate
measurements must be taken at a single location at varying time intervals. The average
sound level reading shall be used to determine whether there has been a violation of this
Ordinance.

7. *Monitoring Report:* The report for each measurement session must include:

   a. The day, date and time of the measurements,

b. Date and time of recent calibration,

c. Temperature and wind speed the time of measurement,

d. Identification of the monitoring equipment,

e. Location, land use, and description of the source,

f. Location and land use of the listener, and

g. Sound level measurements.

8. *Extraneous Sounds*: If there are extraneous sound sources that are unrelated to the measurements and increase the monitored sound level, the measurement shall be postponed until these noises subside.

**ARTICLE V: NOISE LIMITATIONS:** It shall be unlawful for any Data Center to make, or continue to cause or permit to be made or continued, noise levels constituting a noise disturbance. For the purposes of this section, the external noise level emanating from Data Centers shall be deemed disturbing to a person, reasonably calculated to disturb the peace and unreasonably offensive and injurious to the public, or their property, if the sound level is:

1. 65 dBa or higher during the hours of 8 A.M. to 10 P.M. or 55 dBa or higher during the hours of 10 P.M. to 8 A.M. (as determined by a third-party acoustic engineer) measured at the property line of the receiving property.

2. The standard which may be considered in determining whether a violation of this Ordinance exists includes but is not limited to the following:

a. The level or volume of the noise

b. The time of day or night the noise occurs

c. The duration of the noise

d. Whether the noise is recurrent, intermittent or constant

e. Whether proper and reasonable noise attenuation methods were followed and maintained

**ARTICLE VI: VIOLATIONS:**

1. Any or all of the following persons may be held responsible for noise violations:

a. The person operating the equipment or creating the noise;

b. The person who employs the person operating the equipment or creating the noise at the time of the violation;

c. The person who owns or rents the property where the violation occurs.

2. The following acts, and the causing thereof, are declared to be in violation of this Ordinance:

   a. The sound level emanating from the Data Center exceeds 65 dBa or higher during the hours of 8 A.M. to 10 P.M. or 55 dBa or higher during the hours of 10 P.M. to 8 A.M. measured at the property line of the receiving property.

   b. The noise attenuation measures provided in the design plan to the county judge are not incorporated in the construction of the Data Center.

   c. Any of the required sound study results are not filed with the county judge and the county clerk within 30 days of completion of the report.

   d. The building plan is not filed with the county judge and the county clerk within 30 days of completion of the plan prior to construction.

   e. Failure to act in accordance with any other provision of this Ordinance.

3. All data centers shall be in compliance with the requirements of this Ordinance before commencing operation; failure to do so will be deemed in violation of this Ordinance and result in an injunction and/or a stay in commencing operation.

## ARTICLE VII: PENALTIES:

(1) Any person(s), firm, corporation, partnership, association, owner, occupant, agent or anyone having ownership in the subject property or supervision or control over the Data Center that violates or fails to comply with any provision of this Ordinance, shall be guilty of a misdemeanor.

(2) Upon conviction of such violation, any offending party shall be punished by fine of $1,000 for any one specified offense or violation, or double that sum for repetition of the offense or violation. If the act prohibited is continuous in time, the fine or penalty for allowing the continuance thereof, in violation of this Ordinance, shall be $500 for each day that it may unlawfully continue. If the prohibited act continues after conviction of violation, an injunction in court of proper jurisdiction to abate the nuisance and violation of the Ordinance may be sought and awarded.

(3) The county or any citizen shall be entitled to pursue all legal and equitable remedies available under the law in order to abate the nuisance and compel compliance with this Ordinance, including injunctive relief and any civil damages the court deems appropriate.

(4) Until the Data Center is in compliance with this Ordinance and required noise attenuation

measures are implemented and noise limitations met, the data center shall cease operations.

      <u>ARTICLE VIII: SEVERABILITY:</u> If any provision of this Ordinance is found to be invalid by the decision of any court of competent jurisdiction, such invalidity shall not affect the remaining sections, phrases, and provisions of this Ordinance which remain valid and enforceable.

      <u>ARTICLE IX: EMERGENCY CLAUSE:</u> The Quorum Court finds that the immediate implementation of this ordinance is necessary for the preservation of the public's peace, health, safety, welfare, and property, an emergency is hereby declared to exist and that this Ordinance is to be in effect immediately after its adoption.

**PASSED AND APPROVED this 11th day of July, 2023.**


Thomas E. Best
Arkansas County Judge


ATTEST:


Melissa Wood
Arkansas County Clerk


I certify that this instrument was
filed and recorded in
ORDINANCE&RESOLUTION
Book 2023
07/11/2023  10:30
MELISSA WOOD
County Clerk
**ARKANSAS County, AR**



FILED

OCT 10 2023

TIME: 11:57 Am

MELISSA WOOD, CLERK
ARKANSAS COUNTY, ARKANSAS

ORDINANCE NO. 2023-_11_

AN EMERGENCY ORDINANCE AMENDING CERTAIN RULES AND
REGULATIONS CONCERNING EXTERNAL NOISE ATTENUATION OF DATA
CENTERS AND TO PREVENT NOISE DISTURBANCE IN ARKANSAS COUNTY AND
WITHIN ITS UNINCORPORATED LIMITS; TO DECLARE AN EMERGENCY; AND
FOR OTHER PURPOSES

**BE IT ORDAINED AND ENACTED BY THE QUORUM COURT OF ARKANSAS
COUNTY, ARKANSAS THAT:**

**WHEREAS,** the equipment associated with the cooling systems and generators required
to operate data centers generate broadband noise and low-frequency hums that result in noise
disturbance. Noise disturbance is the cause of degradation and may produce negative impacts on
public health, property, quality of life and the environment.

**WHEREAS,** noise attenuation should be an integral part of the engineering design and
construction of data centers in order to prevent noise pollution and noise disturbance.

**WHEREAS,** the county finds that the public interest is served by the prevention of
unreasonable noise emanating externally from the Data Centers and the provisions of this
Ordinance are enacted for the purpose of preserving and protecting the public health, safety,
welfare and property of the citizens of Arkansas County, Arkansas.

**WHEREAS,** according to a study funded by NASA and conducted by the California
Polytechnic State University in 2021, researchers found that several common bird species
avoided areas with excess noise.

**WHEREAS,** as stated in a 2015 article in Volume 91 of Biological Reviews by Graeme
Shannon, et al., entitled "*A synthesis of two decades of research documenting the effects of noise
on wildlife*," noise presents diverse threats to species and ecosystems.

EXHIBIT 4

**WHEREAS**, migratory waterfowl have been a critically important industry in eastern Arkansas and Arkansas County for over 100 years, producing hundreds of millions of dollars in revenue for Arkansans.

**WHEREAS**, outdoor activities have been a foundation of the culture and lifestyle important to Arkansas County residents for over 100 years and the protection of the county's natural resources are of utmost importance in the protection and continued development of said activities.

**ARTICLE I: PURPOSE AND APPLICABILITY**: All Data Centers constructed within this jurisdiction shall be designed and built to incorporate external noise attenuation measures to minimize the impact of noise disturbance on the residents of Arkansas County, Arkansas, their property, and the environment, which includes effects on the migratory waterfowl which are acknowledged as an important contributor to Arkansas County's economy and culture. This ordinance shall apply to limit the noise disturbance originating within the unincorporated limits of Arkansas County, Arkansas.

**ARTICLE II: DEFINITIONS**: For the purpose of this Ordinance, the following definitions shall apply unless the context clearly indicates or requires a different meaning:

1. *Ambient Noise*: The all-encompassing noise level associated with a given environment, being a composite of sounds from all sources, excusing the alleged offensive noise, at the locations and approximate time at which comparison with the alleged offensive noise is to be made.

2. *Data Center*: A facility constructed and operated that is engaged in storage, management, processing, and transmission of digital data, including facilities used for cryptocurrency

mining, which houses networked computer systems along with supporting equipment such as batteries, back-up power generators, HVAC and cooling systems.

3. *Decibel (dB)*: A unit for measuring the volume of a sound, equal to twenty (20) times to the base 10 (10) of the ratio of the pressure of the sound measured to the referenced pressure, which is twenty (20) micropascals (twenty (20) micronewtons per square meter.)

4. *Mechanical Equipment*: The networked computer systems along with supporting equipment such as batteries, backup generators, and cooling systems housed on the Data Center's property.

5. *Noise Attenuation*: The reduction of noise levels through the use of sound-absorbing material, architectural or engineering design techniques, and/or any other suitable means.

6. *Noise Disturbance*: any sound which:

  a. Endangers or injures the safety or health of humans or animals; or

  b. Annoys or disturbs a reasonable person of normal sensitivities; or

  c. Endangers or injures person or real property.

7. *Person*: An individual, association, partnership, or corporation, including any officer, employee, department, or agency.

8. *Property Line*: An imaginary line along the ground surface, and its vertical extension, which separates the real property owned by one person from that owned by another person, but not including intra-building real property divisions.

9. *Sound*: An oscillation in pressure, particle displacement, particle velocity or other physical parameter, in a medium with internal forces that causes compression and rarefaction of that medium. The description of sound may include any characteristic of

such sound, including duration, intensity and frequency.

10. *Sound Level*: The weighted sound pressure level obtained by the use of s sound level meter and frequency weighting network, such as A, B, or C as specified in American National Standards Institute specifications for sound level meters (ANSI SI. 4-1971, or the latest approved revision thereof). If the frequency weighting employed is not indicated, the A-weighting shall apply.

11. *Sound Level Meter*: An instrument which includes a microphone, an amplifier, RMS detector, integrator or time averager, output meter, and weighting networks used to measure sound pressure levels.

12. *Migratory waterfowl*: all waterfowl species in the family Anatidae, including wild ducks, geese, brant, and swans.

**ARTICLE III: NOISE ATTENUATION REQUIREMENTS:** Before a Data Center has commenced construction or operating within this jurisdiction, the property owner and operator proposing to build a Data Center shall comply with the following:

1. *Notice Requirements*

    a. The property owner and operator shall notify the following:

        i. all residents within a half-mile radius of the parcel, including any affiliated homeowners' association operating within the half-mile radius;

        ii. all hunters that utilize the area for hunting in a ten (10) mile radius and all waterfowl hunting clubs that operate as a for profit business in a twenty (20) mile radius.

    b. The property owner and operator shall notify the above groups that they intend to build and operate a Data Center on the property. The notice required in this section must be mailed, where reasonably possible, to all postal addresses and homeowners' association

addresses contained within the required radius extending from the property line where the proposed Data Center will be built. Where notification by mail is not reasonable, notification by local media outlets shall be required to be run continually for a two-week period. Proof of notification shall be filed with the county clerk's office within 30 days of providing notice. The County Judge shall issue a letter to the property owner and operator that the notification has been satisfactorily completed prior to construction commencing. The property owner and operator must notify the County Judge that the property owner and operator intends to build and operate a Data Center. The notification must include the location for the proposed data center.

2. *Noise Study Requirements*

a. The property owner of the lands upon which the Data Center is to be located shall conduct a sound study performed by a third-party acoustic engineer to document baseline sound levels in the area of the proposed Data Center, including noise levels measured at the property line in eight locations (north, south, east, west, northeast, northwest, southeast, southwest) and above the proposed location of the Data Center. The report of the study shall include sound mitigation recommendations based on the results of the sound study. The property owner must provide a copy of the report of the study to the county judge and file with the county clerk within 30 days of completion of the report and prior to the start of construction.

3. *Noise Attenuation Plan Requirements*

a. The property owner shall consult with a third- party architectural or design firm to develop a building plan that includes necessary noise attenuation measures in

order to prevent the external sound level emanating from the Data Center from exceeding the sound level limitations below which will be considered a noise disturbance. The building plan is not required to adopt any or all of the noise attenuation recommendations so long as the plan includes noise attenuation measures that the architectural or design firm deems adequate to be in compliance with this Ordinance. Noise attenuation measures may include but not limited to:

  i. Soundproofing walls, screens, panels, fences, or enclosures

  ii. Buffer yards

  iii. Other noise attenuation measures recommended by the third-party acoustic engineer

b. Mechanical equipment shall be shown on any proposed plan and shall be fully enclosed on all sides, with insulated, sound-attenuating walls on all sides and roof. The building housing such mechanical equipment, shall also be screened by a visually solid, sound-attenuating fence, screen, wall, panel, or parapet wall and constructed with a design, materials, details, and treatment compatible with those used on the nearest façade of the building.

c. The property owner shall provide a copy of the building plan to the county judge and file with the county clerk within 30 days of completion of the plan and prior to construction.

d. Any additions, changes, or expansions of the Data Center shall comply with the noise attenuation requirements of this Ordinance and shall be designed and submitted to the county judge and filed with the county clerk within 30 days of completion of the report.

4. *Post Completion Noise Study Requirements*

    a. Upon the Data Center's completion, the Data Center operator must conduct a

post-construction noise study performed by a third-party acoustic engineer to

document noise levels emanating from the Data Center when mechanical

equipment is running at full capacity, including all HVAC units and generators

necessary for peak operation. Noise levels are to be measured at the property line

in the original nine locations used during the baseline study. The Data Center

operator must provide a copy of the report to the county judge and file with the

county clerk within 30 days of completion of the study.

    b. The Data Center shall not begin operations until the completion of the postconstruction

noise study and submission to the county judge and county clerk as

required above. In order for the Data Center to be in compliance, the noise study

results must show that its operation is in compliance with this Ordinance. If the

results show that the Data Center is not in compliance with this Ordinance, the

Data Center will be unable to commence operation until the required noise

attenuation measures and noise limitations are met.

    c. The County Judge shall issue an Environmental Noise Compliance Permit to every

applicant that demonstrates compliance with the requirements of this ordinance.

    d. No data center shall operate without an Environmental Noise Compliance Permit.

    e. Furthermore, the Data Center operator must conduct annual noise studies under

the baseline and post-construction studies specifications in accordance with

subsections (a) and (b) above. The Data Center operator must provide the results

to the county judge and file with the county clerk within 30 days after the

anniversary date of the first sound study report.

**ARTICLE IV: PROCEDURE FOR MEASUREMENT:** All tests shall be conducted

according to the following procedures:

1. *Alleged Violation*: When a noise violation is alleged to have occurred, measurements

will be taken at the property line of the receiving property or if related to the escape of noise

from above the Data Center then from the center of the Data Center property.

2. *Normal Monitoring:* When the measurement procedure is in the normal course of

monitoring sound, the measurements will be taken at the real property line of the source

of the sound.

3. *Outdoor Conditions:* No outdoor measurements must be taken while winds exceed

(Including gusts) 15 miles per hour; under conditions that will allow the sound level

meter to become wet; or when the ambient temperature is out of range of tolerance on the

sound meter.

4. *Calibration*: The sound level meter must be verified and calibrated according to the

manufacturer's specifications immediately prior to taking the measurements.

5. *Meter Placement:* The sound level meter shall be placed a minimum of four feet above

the ground or from any reflective surface for the ground measurements. The sound level meter

shall be placed 200 feet above the roof of the Data Center for the above measurements. The

microphone shall be pointed at the sound source.

6. *Measurements:* Measurements must include "high", "average", and "low" readings. If the

sound level meter does not provide these multiple readings, a minimum of three separate

measurements must be taken at a single location at varying time intervals. The average

sound level reading shall be used to determine whether there has been a violation of this

Ordinance.

7. *Monitoring Report:* The report for each measurement session must include:

    a. The day, date and time of the measurements,

    b. Date and time of recent calibration,

    c. Temperature and wind speed the time of measurement,

    d. Identification of the monitoring equipment,

    e. Location, land use, and description of the source,

    f. Location and land use of the listener, and

    g. Sound level measurements.

8. *Extraneous Sounds*: If there are extraneous sound sources that are unrelated to the measurements and increase the monitored sound level, the measurement shall be postponed until these noises subside.

    **<u>ARTICLE V: NOISE LIMITATIONS:</u>** It shall be unlawful for any Data Center to make, or continue to cause or permit to be made or continued, noise levels constituting a noise disturbance. For the purposes of this section, the external noise level emanating from Data Centers shall be deemed disturbing to a person or the environment, reasonably calculated to disturb the peace and unreasonably offensive and injurious to the public, their property, or the environment if the sound level is:

1. For the points north, south, east, west, northeast, northwest, southeast, southwest of the Data Center 55 dBa or higher during the hours of 8 A.M. to 8 P.M. or 45 dBa or higher during the hours of 8 P.M. to 8 A.M. (as determined by a third-party acoustic engineer) measured at the property line of the receiving property.

2. For the point above the Data Center 70 dBa or higher, unless a study recognized by either the Arkansas Game and Fish Commission or wildlife conservation organization shows that continual noise above 70 dBa has no impact on migratory waterfowl.

3. The standard which may be considered in determining whether a violation of this Ordinance exists includes but is not limited to the following:

    a. The level or volume of the noise

    b. The time of day or night the noise occurs

    c. The duration of the noise

    d. Whether the noise is recurrent, intermittent or constant

    e. Whether proper and reasonable noise attenuation methods were followed and maintained

## **ARTICLE VI: VIOLATIONS:**

1. Any or all of the following persons may be held responsible for noise violations:

    a. The person operating the equipment or creating the noise;

    b. The person who employs the person operating the equipment or creating the noise at the time of the violation;

    c. The person who owns or rents the property where the violation occurs.

2. The following acts, and the causing thereof, are declared to be in violation of this Ordinance:

    a. The sound level emanating from the Data Center exceeds 55 dBa or higher during the hours of 8 A.M. to 8 P.M. or 45 dBa or higher during the hours of 8 P.M. to 8 A.M. measured at the property line of the receiving property.

b. The sound level emanating from the Data Center exceeds 70 dba unless the above stated condition has been meet.

c. The noise attenuation measures provided in the design plan to the county judge are not incorporated in the construction of the Data Center.

d. Any of the required sound study results are not filed with the county judge and the county clerk within 30 days of completion of the report.

e. The building plan is not filed with the county judge and the county clerk within 30 days of completion of the plan prior to construction.

f. Failure to act in accordance with any other provision of this Ordinance.

3. All data centers shall be in compliance with the requirements of this Ordinance before commencing operation; failure to do so will be deemed in violation of this Ordinance and result in an injunction and/or a stay in commencing operation.

## ARTICLE VII: PENALTIES:

(1) Any person(s), firm, corporation, partnership, association, owner, occupant, agent or anyone having ownership in the subject property or supervision or control over the Data Center that violates or fails to comply with any provision of this Ordinance, shall be guilty of a misdemeanor. Each day of operation in which the violation is occurring shall be a separate offense.

(2) Upon conviction of such violation, any offending party shall be punished by fine of $1,000 for any one specified offense or violation, or double that sum for repetition of the offense or violation. If the act prohibited is continuous in time, the fine or penalty for allowing the continuance thereof, in violation of this Ordinance, shall be $1000 for each day that it may unlawfully continue. If the prohibited act continues after conviction of

violation, an injunction in court of proper jurisdiction to abate the nuisance and violation of the Ordinance shall be sought and awarded.

(3) The county or any citizen shall be entitled to pursue all legal and equitable remedies available under the law in order to abate the nuisance and compel compliance with this Ordinance, including injunctive relief and any civil damages the court deems appropriate.

(4) Until the Data Center is in compliance with this Ordinance and required noise attenuation measures are implemented and noise limitations met, the data center shall cease operations.

**ARTICLE VIII: SEVERABILITY:** If any provision of this Ordinance is found to be invalid by the decision of any court of competent jurisdiction, such invalidity shall not affect the remaining sections, phrases, and provisions of this Ordinance which remain valid and enforceable.

**ARTICLE IX: EMERGENCY CLAUSE:** The Quorum Court finds that the immediate implementation of this ordinance is necessary for the preservation of the public's peace, health, safety, welfare, and property, an emergency is hereby declared to exist and that this Ordinance is to be in effect immediately after its adoption.

**PASSED AND APPROVED this** _10th_ **day of** _Oct._ **, 2023.**

_Thomas E. Best_

Thomas E. Best
Arkansas County Judge

**ATTEST:**

Melissa Wood
Arkansas County Clerk